**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY and SELF, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 7, 2018**

# In the Court of Appeals of Georgia

A17A1500. BLACKMON et al. v. PENA.                    SE-057

SELF, Judge.

In this contract dispute, restauranteur Irma Pena sued contractor Kirk Blackmon d/b/a Atlanta Concrete Creations and Kirk Blackmon, Inc. d/b/a Georgia Sunroom (collectively, "Blackmon") for damages related to work Blackmon performed during the construction of an exterior patio and sunroom addition at Pena's restaurant. Following a bench trial, the Superior Court of Spalding County entered a final judgment in Pena's favor for breach of contract and negligent construction, and Blackmon appeals. For the reasons that follow, we affirm.

Evidence adduced at trial revealed that Pena had planned for some time to add a patio and sunroom to the Mexican restaurant she and her husband owned in Forsyth.

Pena's niece located Blackmon during an Internet search, telephoned him, and Pena ultimately met with him at the restaurant. One to two weeks after meeting with him, Pena signed two contracts with Blackmon on May 9, 2013, for the construction of an exterior patio and a four-season sunroom.[1] The contract prices for the sunroom and the exterior patio were $53,997 and $13,000, respectively, and construction was to begin "in 4-5 weeks" from May 9, 2013, and be completed in "3-5 weeks" (sunroom) and "1-2 weeks" (exterior patio). Pena gave Blackmon a deposit of $28,000 when she signed the contracts for the project, but did not hear from him for six to seven weeks thereafter. In fact, Blackmon did not obtain a building permit until July 1, 2013 – more than two weeks after construction was slated to begin and, in the case of the patio, after the patio should have been completed.

---

[1] The sunroom contract is silent as to whether the roof would be a gabled or "studio" (which is a more flat design) roof. Although the contract refers to an engineered roof, Blackmon testified that an "engineered roof can be gabled [or i]t can be studio." Indeed, although Blackmon's statement of facts in his opening brief states the sunroom contract required a "studio-style" roof, there is no such term in the contract.

According to Pena, after viewing photographs of Blackmon's work,[2] Blackmon told her that the sunroom addition "was going to blend in with the existing building...[a]nd that's what I expected." As a result, Pena believed that Blackmon would install a gabled roof on the sunroom, as depicted in his marketing materials, to match the roof of the original restaurant. However, when work on the project commenced, Pena reported being dissatisfied with Blackmon's work. With regard to the patio, Pena cited Blackmon's use of warped wood on the pergola and the lack of any support for concrete pavers on the patio resulting in uneven flooring and puddling. Concerning the sunroom, Pena stated that Blackmon used residential doors, rather than commercial doors with a push bar, for the emergency exits, and complained that the painting was "bad," the ceiling was too low, the flooring was "really bad," and the exterior stucco did not match the stucco on the original building as promised. At one point, Pena asked Blackmon and his subcontractor, Hiram "Shane" Stone, to rebuild the patio; they declined. Despite these concerns, particularly with the installation of a flat roof rather than a gabled roof as she

---

[2] Blackmon acknowledged that certain statements in his brochure, including that he was bonded and insured, were not entirely accurate, stating that he "had insurance in the past" and that he had only been bonded for work in Cobb County.

envisioned,[3] Pena neither asked Blackmon to stop work on the roof nor provided any concerns in writing. In fact, Blackmon always told her that he had not finished and that "[i]t's going to be gorgeous, it's going to look beautiful, you need to wait."

On September 23, 2013, Pena sent Blackmon a letter instructing him to stop work on the project.[4] At that point, some ten weeks after construction was due to be completed, Pena testified that neither the exterior patio nor the sunroom were functional for serving customers. Pena retained a new contractor, Bobby Ivey, who removed and replaced the pergola and completed work on the exterior patio and the sunroom. In doing so, Ivey removed the residential doors Blackmon installed and replaced them with emergency exit doors and replaced the stucco. Ivey also removed and replaced the flat roof of the sunroom with a gabled roof.[5]

---

[3] A friend of Pena's also reported concerns with the workmanship on the roof, including a lack of screws to keep the roof in place during high winds and leaks in the roof.

[4] Of the total $66,997 contract price, Pena paid Blackmon $44,297, leaving a balance due of $22,700.

[5] Pena paid Ivey a total of $60,748.08 for his work, of which $20,819.35 comprised work on the roof. By subtracting the amount outstanding in Pena's contract with Blackmon ($22,700) from the amount Pena paid Ivey ($60,748.08), the trial court concluded that Pena "paid $38,084[.80] more than what you bargained for with Mr. Blackmon."

For his part, Blackmon denied that Pena asked for a gabled roof. Instead, he claimed Pena asked about a gabled roof but balked at the price. Regarding the quality of the work, Blackmon testified that, while an inspector required that he make certain changes to the electrical system, it and all other facets of his work ultimately passed inspection. Blackmon's subcontractor, Stone, testified that he began working on the project in July 2013.[6] Blackmon gave Stone a scope of work, which included blueprints and drawings, and Stone used pre-engineered materials ordered specifically for the project. The pre-engineered materials are designed to be waterproof, and Stone never received any complaint concerning leaks at the project. No one complained to Stone concerning the kind of roof being installed or attempted to stop him from performing work.[7] When he was eventually instructed to leave the project in September 2013, Stone estimated that his work was "98 percent" complete and further testified that the project was substantially complete, including completion of the roof, windows, doors, trim, stucco, electrical system, and HVAC system. In fact, Stone testified that the only work remaining to be done was cosmetic work to the

---

[6] In 18 years as a subcontractor for Blackmon, Stone had built hundreds of sunrooms, about five of which were sunroom additions to restaurants.

[7] The only complaint noted by Stone was the lack of cement between sections of concrete pavers on the patio.

concrete floor. While the roof he built was a flat roof, Stone observed that the roof on the adjacent original restaurant was a gabled roof.

Neither Blackmon nor Pena requested that the trial court enter findings of fact and conclusions of law in accordance with OCGA § 9-11-52 (a). As a result, at the conclusion of the bench trial on November 4, 2016, the trial court filed a handwritten final judgment in favor of Pena "against [Blackmon] for breach of contracts and negligent construction in the sum of $38,084.08 plus costs." Because it concluded no fraud had been shown, the trial court declined to award punitive damages.

On November 23, 2016, Blackmon filed a "Motion for More Definite Order" pursuant to OCGA § 9-11-52 (c) in which Blackmon asked the trial court to "amend and clarify" its judgment. But before the trial court ruled on Blackmon's motion, Blackmon filed a notice of appeal on November 29, 2016. On December 1, 2016, the trial court purportedly vacated its November 4, 2016 judgment and, following a hearing, entered a new final judgment containing findings of fact and conclusions of

law on December 12, 2016, nunc pro tunc to November 4, 2016.[8] Blackmon did not appeal from the trial court's December 12, 2016 order.

1. As a threshold matter, it is plain that the trial court's November 4, 2016 judgment constitutes a "final judgment." OCGA § 5-6-34 (a) (1) ("Appeals may be taken to the . . . Court of Appeals from the following judgments and rulings of the superior courts . . .: [a]ll final judgments, that is to say, where the case is no longer pending in the court below. . . ."). Moreover, "[t]he filing of a notice of appeal serves to supersede a judgment and while on appeal, the trial court is without authority to modify such judgment." *Aetna Cas. & Surety Co. v. Bullington*, 227 Ga. 485 (1) (181 SE2d 495) (1971); *BJL Enterprises v. Level One Contact*, 314 Ga. App. 42, 45 (1) (722 SE2d 877) (2012). As a result, the trial court's December 1, 2016 order "attempting to vacate the prior [November 4, 2016] judgment, though rendered during the same term of court, was a nullity, even assuming that the prior judgment could be

---

[8] We note that the trial court's December 12, 2016 judgment demonstrated an improper use of a "nunc pro tunc" entry. "[T]he purpose of a nunc pro tunc entry is to record some previously unrecorded action actually taken or judgment actually rendered. It may not be used to supply an order not yet made by the court." (Citation and punctuation omitted.) *In the Interest of H. L. W.*, 244 Ga. App. 498 (535 SE2d 834) (2000) (nunc pro tunc entry "did more than correct mere 'clerical errors' or record some previously unrecorded action and was, therefore, an improper use of a nunc pro tunc entry"). Id.

set aside without any meritorious reason being given therefor."[9] *Bullington*, 227 Ga. at 485 (1). See also *Level One*, 314 Ga. App. at 45 (1). It necessarily follows that the trial court's December 12, 2016 order is, likewise, a nullity. See *Bullington*, 227 Ga. at 485 (1).

However, these subsequent orders do not necessarily render Blackmon's appeal from the November 4, 2016 final judgment moot, see, e.g., *In the Interest of R. W.*, 186 Ga. App. 885 (1) (368 SE2d 824) (1988); *D. P. v. State*, 129 Ga. App. 680, 681 (1) (200 SE2d 499) (1973), although the absence of written findings of fact and conclusions of law "is ground for affirmance when they are necessary for resolution of the issue on appeal." *Beeks v. Consultech, Inc.*, 222 Ga. App. 473, 474 (474 SE2d 675) (1996). Blackmon's opening brief to this Court contains five enumerations of error. To the extent the record permits, we will address each in turn.

2. Enumerations 1, 2, and 4 challenge certain specific findings of fact and conclusions of law in the trial court's December 12, 2016 order. In view of our

---

[9] Spalding County has two terms of court annually, beginning the "[s]econd Monday in March and [the] second Monday in September." OCGA § 15-6-3 (19) (C). As a result, each of the relevant filings in this case occurred during the September term of court.

8

discussion in Division 1, supra, these enumerations present nothing for our review.[10]

See *Beeks*, 222 Ga. App. at 474.

3. In his third enumeration, Blackmon contends that the trial court "ignored" Pena's failure to provide a written objection to his work, as required by the parties' contracts, and instead allowed Blackmon to continue working on a roof Pena did not want. Similarly, Blackmon's fifth enumeration contends that he "is entitled to have this case decided by this [C]ourt *de novo*." It appears that the substance of these arguments is that this case involved contract enforcement for which Blackmon should have prevailed, and that the enforcement of contracts is a question of law subject to de novo review on appeal.[11] However, Blackmon never presented to the trial court any argument concerning the need for construction of the parties' contracts.[12] Rather,

---

[10] We further note that Enumeration 4 is not supported by a single citation of authority. See Court of Appeals Rules 25 (a) (3) and 25 (c) (2).

[11] Because this enumeration does not address the trial court's judgment in favor of Pena for negligent construction, we do not reach that portion of the judgment.

[12] The trial court's statements concerning ambiguity in the parties' contracts, made during a December 12, 2016 hearing on Blackmon's "Motion for More Definite Order," were not memorialized in its December 12, 2016 judgment. See *Beeks*, 222 Ga. App. at 474 ("Oral findings are not sufficient."). In any case, the remarks are not relevant to our decision because the trial court was without authority to vacate its November 4, 2016 order, to conduct the December 12, 2016 hearing, or to enter the December 12, 2016 judgment. See generally *Bullington*, 227 Ga. at 485 (1).

9

he argued that Pena received the roof required under the parties' contract and that she simply "just changed her mind about what she wanted."

Nevertheless, the proper inquiry in this case is whether there was *any evidence* to support the trial court's conclusion that Pena was entitled to recover for a breach of the parties' contracts. See *Infinite Energy v. Cottrell*, 295 Ga. App. 306, 307 (671 SE2d 294) (2008) ("On appeal from a bench trial, we construe the evidence favorably to the trial court's judgment and affirm if *any evidence* supports it.") (emphasis supplied); *Dabdoub v. Global Home Image*, 291 Ga. App. 298, 299 (661 SE2d 669) (2008). To that end,

> [o]n appeal, this court must not substitute its judgment for that exercised by the trial court when there is some support for the trial court's conclusion. Our duty is not to weigh evidence de novo, but to merely determine if there is *any evidence* which supports the judgment below. *Even in the face of conflicting evidence, the trial court's judgment will be upheld as long as there is any evidence to uphold the lower court's determination*.

(Citations and punctuation omitted; emphasis supplied.) *Edwards v. Wilson*, 185 Ga. App. 514, 515 (1) (364 SE2d 642) (1988) (citing *Cessna Finance Corp. v. Design Eng. & Constr. Intl.*, 176 Ga. App. 206, 208 (335 SE2d 625) (1985)). In that vein, evidence revealed that Pena and Blackmon executed two contracts for the

10

construction of an exterior patio and sunroom, respectively; that the sunroom contract was silent as to the type of roof to be installed; that, after discussions with Blackmon and reviewing Blackmon's marketing materials, Pena expected Blackmon to construct a gabled roof for the sunroom that matched the roof of the existing restaurant building; that Pena never received contrary drawings or specifications for the sunroom from Blackmon; that an engineered roof as stated in the parties' sunroom contract could refer to a gabled or "studio" roof; that Blackmon failed to commence work within a certain time frame as required by the contracts; and that Blackmon constructed a "studio" (i.e., more flat) roof.[13]

Moreover, the trial court found that Pena paid Ivey, the second contractor, a total of $60,748.08 for his work. By subtracting the amount outstanding in Pena's contract with Blackmon ($22,700) from the amount Pena paid Ivey ($60,748.08), the trial court concluded that Pena "paid $38,084[.08] more than what [she] bargained for with Mr. Blackmon" and awarded Pena $38,084.08. As a result, because there was

---

[13] As the trier of fact, the trial court apparently determined that Blackmon's conflicting testimony that Pena ordered a flat roof and that he gave her plans demonstrating a flat roof was not credible. See *Rice v. Lost Mountain Homeowners Assn.*, 269 Ga. App. 351, 357 (7) (604 SE2d 215) (2004) ("Where the trial court is the finder of fact, it determines weight, credibility, opinion evidence, sufficiency, and admissibility of all evidence; if there is any evidence to support the judgment, it must be affirmed.").

some evidence to support the trial court's conclusion, we affirm the trial court's judgment in favor of Pena on her claim of breach of contract. See *Infinite Energy*, 295 Ga. App. at 307; *Dabdoub*, 291 Ga. App. at 299; *Rafferzeder v. Zellner*, 272 Ga. App. 728, 731 (2) (613 SE2d 229) (2005) ("the measure of an owner's damages for a construction contractor's breach is the cost of completing the contract or correcting the defective work, minus the unpaid part of the contract price.") (punctuation, footnote, and emphasis omitted).

*Judgment affirmed. Dillard, C. J., and Ray, J., concur.*

SELF, Judge, concurring specially.

For more than eleven years, I have had the good fortune and distinct privilege to serve my fellow Georgians as a trial and appellate judge. Without a doubt, this unique and unparalleled opportunity has been the highlight of my legal career. With the filing of this opinion, my service on this distinguished Court and in Georgia's judicial system comes to an end. As others have occasionally done, I am taking a point of personal privilege in my last opinion to thank some of the many people who have meant so much along this journey.[1]

_____

[1] See, e.g., *McCain v. State,* 300 Ga. 400, n.3, (794 SE 2d 58)(2016) (Thompson, C.J.); *Gwinnett Cty. v. Yates,* 265 Ga. 504, 509(458 SE 2d 791, 795)(1995) (Hunt, C.J.); *Davis v. City of Macon,* 262 Ga. 407(421 SE 2d 278)(1992) (Weltner, C.J.,

I wish to thank the voters of the Macon Judicial Circuit who first elected me in 2006; without their confidence and support, I would not have a judicial career. During my time on the superior court bench, I served with some of the finest trial judges in our great state and learned many valuable lessons from each of them.

I owe Governor Nathan Deal an immeasurable debt for the trust and confidence he showed when he appointed me to this Court. No governor has impacted the judicial branch more than Governor Deal and it was an honor and privilege to be among his appellate appointees.

I wish to thank the members of this Court who have treated me so kindly and become like family. These talented and gifted judges, attorneys, and staff serve our great state with honor and integrity every day to insure this portion of our appellate legal system works extraordinarily well, and it was an honor to serve with them.

I have always believed it wise to surround oneself with those smarter and more talented. For the last year, I had that pleasure by serving on this panel with my fellow middle Georgians, Chief Judge Stephen Dillard and Presiding Judge Billy Ray. I could not have asked for a better team and I thank them for their hard work, sharp

---

concurring); *Grantham v. State,* 244 Ga. 775, 776 (262 SE 2d 777) (1979) (Hall, J., concurring).

pens, and great wisdom. They made my opinions better and saved me from many a pitfall. They have made me a better judge and a better person.

Finally, I wish to thank my longtime assistant, Cheryl Collins, and my unmatched staff attorneys Julianne Whisnant, Jessica Wright, and Chad Jacobs for their excellent work. They deserve all of the credit for our exceptional opinions and I alone take the blame for any mistakes. Each work tirelessly behind the scenes with little recognition and our Court is lucky to have them. Like Kunz, one of the many heroes in Sir Thomas Carlyle's *Sartor Resartus*, they have consistently turned chaos into order, and done so with amazing skill, Job-like patience, and limitless grace.[2] They truly exemplify the maxim: "*sic vos non vobis.*"[3]

I will always cherish my time on this most honorable Court.

God bless the great State of Georgia; may she forever endure as the greatest of all states.

---

[2] *Sartor Resartus*, Sir Thomas Carlyle 93 (Odyssey Press 1937).

[3] "Thus ye labour, but not for yourselves." *Id.*, p. 235.

3